Case number 18-2228 Antonio Vinson v. MDOC et al. Oral argument 15 minutes per side. Mr. Emanuel for the appellant. Good morning, your honors. If it pleases the court, Lennox Emanuel, on behalf of the plaintiff appellant, I would like to reserve three minutes of rebuttal time. We have raised three issues before this court, and they all relate to the issue of deliberate indifference under the Eighth Amendment. Our first issue that we have asked this court to examine is whether the conduct of the three individual defendants, physicians, doctors, Rhodes, Jenkins, and Miles, amounted to deliberate indifference based on the treatment that they afforded an inmate, Michael Vinson, who subsequently died of the injury complained of. Our second issue that we have asked the court to examine is whether there is deliberate indifference, maybe per se, where an individual goes to the physicians and complains of a specific injury continually over 20 times. And on each occasion, the only medical procedure employed by the three physicians and the nurses subsequently was a physical examination and the prescription of generic medication. Am I correct, counsel, that the symptoms, the complaints, changed over time? There were some that were repetitive, but sometimes the symptoms changed and sometimes the medications changed. Do you agree that the medical professionals seem to listen enough to prescribe different methods of care over this long course? No, Your Honor, and it was only six months. What I would tell the court that in addition to this specific complaint, lower left abdomen pain, he did occasionally complain of back pain. But throughout the documents, and this is the medical documents, throughout those documents, there is this consistent complaint of left lower abdominal pain, and that is what we focus on. We have not accused them of failing to treat a back pain or a neck pain. He made more than 30 visits to the infirmary in the prison complaining of this specific... Doesn't that really hurt your case because, as I understand it, your expert report was stricken for some type of violation and you didn't dispute that. So if we're in the domain of the case law that suggests you need verifying medical evidence, it's outside my competence, I would say, to dispute whether abdominal pain is a symptom of what seems like a rare type of aneurysm that happened in the case. What I would respond to in that context, Your Honor, is the issue of deliberate indifference is more about the adequacy of treatment as opposed to whether or not you absolutely have to make a diagnosis, a correct diagnosis, as to what the injury is. The consistent doctrine in the Sixth Circuit has been with respect to deliberate indifference is that we are more focused on the adequacy of the treatment, even if you can't, in the end, determine the exact ailment. Let's say, for instance, right, we are talking about an aneurysm. But if the only thing you do is to do a hands-on physical examination, each of the 9 to 10 times the physician saw him, and then the other 15 times that the nurses and the nurse's practitioners also examined him, that should amount to inadequate treatment. I thought because you at least concede that there was some treatment, you just think it was woefully deficient. Once we're in the inadequate treatment, don't you need, for instance, another doctor to come in and testify that this was inefficient, they should have done this, this, and this, instead of this, and this falls well below the standard of care. And I just don't see that you have that type of what I would call, what our cases have called, verifying medical evidence. And so you have what they did, and it seems like they didn't do much, but don't you need medical evidence confirming that they should have done much more? I think you need medical evidence confirming that they should have done more, frankly, if you're actually doing an analysis of a medical malpractice case more than an Eight Amendment deliberate indifference case. I think, and there are decisions that I've cited in my brief to the court, and there's also one that's particularly on point, although it's a district court case, the Jones case, where the court can, using its experience and common sense, determine whether or not the physicians adequately responded to the injury. For instance, in this case, Your Honor, the three physicians ordered almost a dozen lab tests. Dr. Jenkins ordered six, and Dr. Miles ordered maybe an additional three or four or five. And there is no indication in the medical records that one, the lab tests were done, or two, that they even reviewed the lab tests. Is there any evidence that had they done the lab tests, looked at them, done everything properly, that anything would have been different? You don't need to go that far, Your Honor. If the basic concept is you've ordered lab tests, but you've never reviewed them, why would you need to show what they would have done? That by itself should be per se evidence that the physicians did not properly treat the patient. How do we judge whether the care was grossly inadequate or not? I mean, you say it's grossly inadequate. Why? Because you didn't do these other things, X, Y, and Z. But are X, Y, and Z consequential? I mean, don't you need an expert to testify, yes, you should have done X, Y, and Z, and in my medical opinion, it was grossly inadequate because you did not do X, Y, and Z, because X, Y, and Z would have or could have, perhaps, led to the proper diagnosis. Well, I think we have to start with the idea that whatever the physician does is consequential. So if you ordered lab tests, why else would you order lab tests unless they are consequential or unless they relate to the complaint of injury? I can't, I'm not sure the answer, but you say that they were ordered. Correct. And the fact that they, I think it's that you say only that the record does not show that they read them. Correct. Does that establish that they were not read? For so many different purposes, it does. I mean, how are we to assume anything else but what's in the medical records? We have to proceed on the assumption, Your Honor, that the medical record speaks to the universe of treatment accorded an individual. That's the Bible or the doctrine as to what they did. Whether there was a discussion about an injury, whether it was a treatment, it's all reflected in the medical records. We have nothing else to go on. And there is no record by the defendants that the lab tests were done or that they reviewed the lab tests. They had the opportunity during the summons. Plaintiff's burden, right? It's your client's burden. So I'm not confident that you're correct that the absence of the readouts establish for your client's purposes that it was not done. I don't know what else a plaintiff would have to do. For instance, we got all the medical records. We deposed the physicians. And there is no... I can't recall if that was the case. And just for the record, I was not the attorney at that time when some of this happened. But my submission to the court is you are allowed to go on what's before you. That's the medical records. The medical records should speak to the universe of the treatment. Now you're saying the defendant had the duty to assure itself that it offered all the medical records. Let's say they forgot, they didn't add it to the file. I mean, can this court look at that possibility? No, Your Honor. Because here is what happened. We got the entire universe of the medical records. We have 196 pages of records. And so we read from the time they started treatment for this specific condition to the time he died. I understand your argument. Then I think you've answered the question. It's not there. Right. It's not there at all. So this is on summary judgment, obviously. So you deposed the three defendants, right? The individual doctors? Two were deposed. One, I understand, suffered a stroke and so was not available. That was Dr. Jenkins. But you had more available to you than just the medical records. I mean, you had the opportunity, I suppose, to go through discovery, right? Interrogatories, requests for admission, depositions. You could retain an expert. I mean, that opportunity was there. You weren't hampered solely by the records, right? We weren't solely hampered by the records, but there were other issues that are before this court, but it's not up on appeal. There's a motion to supplement the record that this court may be aware of, and that was another issue. The frustrating thing for me, Your Honor, is I was not involved in any of that, so I am speaking from kind of a second perspective with respect to what happened during discovery. You're talking about the employment, Dr. Miles' employment record? Yes, the termination of Dr. Miles, yes, Your Honor. The final issue, Your Honor, would relate to whether or not Corizon itself was also liable under Monell. Let me just stop you with a high-level question on the Monell claim. Do you concede that it rises or falls with the underlying Eighth Amendment claim against the individual such that if he fails to prove that his own rights were violated, then he can't establish a Monell claim automatically? That is, if we find against you on the individual claims, does the Monell claim automatically fall, or do you have any theory for why it would still be cognizable? My theory is that the actions of Corizon stands on its own. For instance, in this case, the claim here is Corizon had instituted two measures. One was the chitin system that required an inmate who sought medical help to first fill out a chitin, and automatically what the chitin would do is defer seeing a physician. You might see a nurse, but not a physician. You'd have to come back a second time. The other point was the deposition of Dr. Miles, where he admitted that the department was severely understaffed, that he was being required to do the work of three to four physicians. And our argument is that those are two specific policies of Corizon in and of itself that resulted in the rationing of health care to Mr. Vinson. And so we don't necessarily believe it. Is that chitin system or whatever, is that an Eighth Amendment violation then? Does that policy violate the, is it a deliberate indifference under the Eighth Amendment? Yes, it would violate his right to have proper care. Not just establishing the policy, counsel, that's not your position. That's probably the policy in prisons all around this country. So it's that, it's the operation I'm assuming is your argument, generally. Yes, right. That the operation understaffing, that the kiting results in a delay. Correct. That is correct, Your Honor. Not kiting itself. Right, exactly. It's the operation of the kiting. Your red light's on. We'll have your full rebuttal time. Counsel. Good morning, Your Honors. John Cardello for the defendants in this case. This is a fairly straightforward adequacy of care claim. And Judge, Magistrate Judge Dawkins Davis did a very thorough and excellent job, as she always does. Judge Cox adopted it in full, specifically addressing counsel's objections. I would only have one thing to add to the R&R. The court said that with regard to the objective component, the aneurysm itself actually didn't rise to that level. Because A, it had not been diagnosed by a physician. And number two, it obviously could not, it would not be obvious to a layman. And so she said that, the court said that as to the aneurysm itself, it fails to satisfy the objective component. However, then the court said that, well, there were all these other symptoms. They were not specific. They were changing at times. And that could satisfy the objective component. I would argue that it still doesn't under Reinhardt, which came out after this opinion. Under Reinhardt, there was care given for those complaints. The back complaints, the GI complaints, and some others that he had. He was given treatment. And so therefore, this is an adequacy of care case. And so absolutely, Reinhardt makes a view about the adequacy of care for something that's not. So they were treating back pain or whatever. Okay, fine, it was adequate. But we're not talking about back pain. We're talking about the aneurysm. So what do we do about this idea that you should have done more that might have led you to figure it out? More diagnostic. I mean, it seems like that's the claim. Right. And again, this court has held that it's not the job of the court to second-guess medical judgment as to what tests should be performed. Or even what tests, had they been, might have shown it. There's no evidence on this record, number one, that any of these tests, any tests that they're asking for, would have shown this aneurysm that ultimately proved fatal. In fact, all of the expert testimony that was presented said that this type of condition typically manifests itself shortly before death. Or shortly before it becomes a very significant problem. And we also know from the record that these defendants had, their involvement with Mr. Vincent had ended some weeks, and in some cases months, six months, I think, in the case of one of the doctors prior to his actual death. So we do go back to what evidence does the plaintiff have on the record that there's objective medical proof on the record that the inadequate treatment being complained of actually caused the harm. Which, of course, would require expert testimony in this case. Because none of us in this room, presumably, are qualified to understand the origins, mechanisms of a very rare aneurysm. I guess the big picture concern I have with your position is the doctor seemed to try to treat the injuries in terms of alleviating pain. But they didn't seem to actually do anything to try to cure whatever was causing it. And the record seemed to be quite, he was suffering quite a bit. He told the ER that he had been vomiting 45 days straight. He was found vomiting and in a fetal position crying on his cot in the prison when he was sent to the ER. It seems like they checked on him, they did basic physicals. But obviously something was wrong if you're vomiting for 45 days straight. And I'm not certain that I see anything in the record on which the doctors tried to figure out what was wrong other than basic physical exams. Well, Your Honor, they did send him to Duane Waters Hospital, which they can do more thorough analysis. They did try to change his diet, which he apparently refused. So I don't think it was merely that they were just giving him aspirin saying, you know, call us in the morning. Excepted that there's limited stuff that physicians can do in a correctional facility. They did what they could do. They sent him to Duane Waters. They worked with a dietician. They changed his medications. The fact of the matter is that it's kind of hard to cure a malady when you don't know what it is. And they were trying to figure out what it is. In retrospect, coulda, woulda, shoulda, if they had sent him out, might they have found something perhaps. But again, with respect to those complaints, the back pain, the vomiting, et cetera, our experts have testified that those aren't related to what actually caused him to pass, which was the aneurysm. Which they're all saying those symptoms don't manifest themselves until it's critical, which was well after the involvement of these defendants. So I just think that in light of Reinhart in particular, this case fails on the objective component. Even if, however, the objective component were to be satisfied, the plaintiff then is obligated to show that each defendant knew of a problem that was serious and significant. That made a conscious decision to do nothing or next to nothing. And actually executed that with full knowledge to a level approaching criminal negligence. And I just don't see anything in this record that would suggest there's that level of near malice. At most, and I don't concede this or suggest it, but at most there could be negligence. This is not a negligence case. A little bit confusingly to me, counsel in some of his papers has said that, well, defendants were successful in convincing the judge to look at this as a malpractice case. We did nothing of the sort. We don't want this to be a malpractice case. We're quite happy with this being a deliberate indifference case. What do you do, what is your response on the Minnell argument? Does it rise and fall solely on the failure to make out the individual claim? I believe the controlling case law, yes, does say that, Your Honor. I am aware, and forgive me, I can't cite it, but I am aware of a case where there was a very, very narrow exception that I think that case is very easily distinguishable on the facts. Well, it seems logical to me. So suppose the individual that provided the deliberate indifference, the plaintiff just failed to sue, and so the plaintiff sued three of the four hospital agents but not the critical fourth one who was really the culprit. It seems to me that conceivably a Minnell claim could go forward if you tied it to the standards of Minnell, tied it to the policy with respect to that fourth individual. So how would you respond to that notion that there can be deliberate indifference by the institution as a whole, including an individual who is not sued, and the only reason why the individual claim fails is because the individual who really caused the Eighth Amendment violation was not a part of the suit? Right, Judge Murphy, and I think that is that narrow case. I think at a minimum it would be the plaintiff's burden to show who wasn't sued and present a reason why they weren't sued if that was going to be the Minnell claim. But even if, just say hypothetically, regardless of all that, a Minnell claim can just stand on its own without any individual liability or potential individual liability. In this case, again, there's no evidence. The KITE program, as Judge Cook pointed out, it's used throughout the country. It's not a Corizon thing. It's an MDOC thing. MDOC, that's their policy. It's not Corizon's. Now, as far as the execution of it goes, an inmate KITES, it's triaged within 48 hours, which meets NCCHC. So understaffing arguably goes to the Minnell claim. I mean, if they're seriously understaffed, I mean, you could argue that that policy, that's the institution. Right, and so let me address it sort of generally and then specifically. So generally, let's say that there was evidence of understaffing. Well, then you have to show how that policy actually was the moving force behind the specific injury of this plaintiff, which it can't do, number one. Number two, there was no understaffing. The evidence on the record, affidavits that are uncontested, and I believe also personnel records, this facility was staffed with five to six physicians at all times at least being on call. That exceeds NCCH standards of 3.5 for a facility of this type. So there was no understaffing to begin with. And again, even if there were, plaintiff's burden is to show that that particular constitutional violation is the moving force behind his injury, and had it been but for that, it wouldn't have happened. There's just nothing there. But you're saying, let me get back to the Minnell. You have to sue and prove a violation against an individual. Take the understaffing argument. Let's say that understaffing did cause an injury. There should have been a guard at my cell, and there wasn't, and he committed suicide or something, and it's because of the understaffing. Would I have to sue whoever the supervisor or whoever the person was that decided what the staffing was in addition to the entity to bring that claim? Or are you saying I couldn't just say there was a policy by X Corp to understaff, and that's what led to my injury? I'm just not sure I understand the question. Can I give you a hypothetical? What if Corizon said, we're just not going to give medical care? Would you be able to bring a Minnell claim against Corizon for just, we don't feel like it, so no care whatsoever? I think that if you could actually point to a policy, not just a suggestion of one, but some kind of memo or something written saying, we realize that NCCHC standards requires X number of physicians at this facility. You know what? We're not going to do it. I could see where you could go forward on that, but you have to show that that's an actual policy. So you have to show that that's an actual written policy, or you have to, there are the three. There's the training, which doesn't apply to this. There's acquiescence of a policy or acquiescence of something that you know is going on, but you don't care. I don't think that really neatly applies to this. So I think what you're dealing with is the third one, which is an actual policy. So first of all, plaintiff is obligated to show that there is an actual Corizon policy that we're going to understaff this facility. There isn't one, number one. Number two, it wasn't understaffed according to NCCHC standards, which the state uses, which everybody uses. So, you know, these are interesting hypotheticals, and I think it would be interesting someday for the court to address whether or not a claim can stand on its own. I think that would be rare. You know, I couldn't articulate what I think the standard should be, but I think as a general rule, there has to be an underlying violation by an individual for it to stand against the court. Well, it could happen if somebody had qualified immunity, right? If you had a qualified immunity case and the person got, and the reason that the individual wasn't liable was because of the lack of clearly established law or something, but it was unconstitutional, in theory there could be a Monell claim, even though there was no individual liability, right? In theory, I suppose, yes, Your Honor, but I just don't think that that would apply to this case. We're not talking this case right now. Your Honors, I have a minute left, but I am done unless you have any further questions for me. Okay. Thank you. Thank you. Rebuttal? Just quickly, Your Honor, with respect to the Monell claim, it's not uncontested. They offered an affidavit, and in response to that, there is the testimony of Dr. Myers, who testified under oath that there was an understaffing issue. He was the person on the ground. So I think, at minimum, that creates an issue of fact with respect to his summary judgment. Brother counsel claimed that they sent the deceased to the ER. They did in December of 2011. They stabilized his condition, and then they said, if the symptoms worsen or persist, you should bring him back. He lost 16, 14 pounds in the first month after the ER visit. He continued to vomit. He continued to lose weight. And for the next five months, they recorded it, they did their physical examinations, and they never sent him back to the ER despite those clear instructions. With respect to the magistrate judge, she just got on the bench. She's new. So I don't know if there's a history of cases there. But the Reinhardt case, I think it actually involved Clarison. And in that case, the narrative is clear. They did everything with respect to that individual. They did the MRIs. They did the CAT scans. They did all of the sophisticated tests and actually stabilized his condition. And then I think it kind of came back up maybe a year afterwards. So that case is clearly not applicable to this matter here, this instant matter. So I don't think that's applicable. And with respect to the expert, the frustrating thing about this case, Your Honor, is I wasn't involved in any of those underlying issues. And it's frustrating for me to read the record and then have to come up to this court and argue some issues. But after I read the decision of the magistrate judge where she struck our expert, her reason was she struck the expert for purposes of the summary judgment but then wrote that she would allow this expert testimony at a trial if the case survived summary judgment. So clearly she was not under the impression that striking the expert would be fatal to the case. Otherwise, I guess the counselor at that time would have definitely at least objected and gone up to the judge, Judge Cox, on that issue. But clearly, in her analysis, she did not think that an expert was required for purposes of summary judgment. And I would ask the court to follow that same rationale. She struck it, but she said if you survive summary judgment, we will allow your expert to participate at the trial level. Thank you. Thank you, Counselor. The case will be submitted, and I think that ends our calendar. So the clerk may adjourn.